UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
**CENTRAL DIVISION at LEXINGTON**

NICHOLAS STOVER,           )
                           )
      Plaintiff,            )
                           )           Case No.
v.                         )        5:19-cv-054-JMH
                           )
AMAZON.COM, LLC, *et al.*,  )        **MEMORANDUM OPINION**
                           )           **AND ORDER**
      Defendants.           )

***

    This matter comes before the Court on Defendants Amazon.com, LLC, AMZN WACS, LLC, and Amazon.com, Inc.'s (collectively "Amazon") Motion for Summary Judgment. [DE 31]. Having considered the matter fully, and being otherwise sufficiently advised, Amazon's Motion for Summary Judgment [DE 31] will be granted.

## I. FACTUAL AND PROCEDURAL BACKGROUND

    From November 6, 2016 to December 21, 2017, Plaintiff Nicholas Stover worked at Amazon's call center in Winchester, Kentucky. [DE 31-1, at 3-14]. During the hiring process, Stover advised Amazon that he had Crohn's disease. *See id.* at 3 (citing [DE 31-3, at 29-30]). Knowing Stover had Crohn's disease, Amazon initially hired him for a short-term Customer Service Associate position. *Id.* at 3 (citing [DE 31-5]).

    On Stover's November 13, 2016, Voluntary Self-Identification of Disability Form [DE 31-4], instead of checking a box indicating he either had or previously had a disability, he checked a box

that stated, "NO, I DON'T HAVE A DISABILITY." Also, on November 13, 2016, Stover participated in a new employee orientation and was provided copies of Amazon's Owner's Manual and Guide to Employment ("Owner's Manual"), Standards of Conduct, and Code of Business Conduct and Ethics. *Id.* (citing [DE 31-6]). Additionally, Stover acknowledged that he understood "that if [he had] any concerns that [he was] being subjected to any form of discrimination, retaliation, or harassment in violation of Amazon's policies, [he] should immediately bring this to the attention" of one of several Amazon employees, Amazon's legal department, or Amazon's anonymous "Ethics Line." [DE 31-6]. Pursuant to the Owner's Manual, "Amazon complies with the Americans with Disabilities Act and applicable state and local laws prohibiting discrimination in employment based on a person's physical, mental or sensory disability." [DE 31-7, at 20]. Additionally, the Owner's Manual states, "Amazon also will provide reasonable accommodation for qualified individuals with a disability where medically necessary to perform one's job, except in cases in which the reasonable accommodation would create an undue hardship or a health or safety risk would exist." *Id.*

Throughout the course of Stover's employment, Amazon's Leave of Absence Accommodations ("LOAA") team handled decisions regarding employees' disability accommodation requests. [DE 31-1, at 4 (citing [DE 31-3, at 17-18; DE 31-8, at 2])]. "Amazon

requested 'medical certification to verify the existence of a disability or work restrictions, to identify potential reasonable accommodations, or to determine any safety and health risks.'" *Id.* (quoting [DE 31-7, at 21]). Amazon provided Stover paid time off in the form of accrued vacation time that could be carried over from year to year, not to exceed 160 hours, and personal time off ("PTO") to be used "'in the event of illness or other personal business.'" [DE 31-1, at 4 (quoting [DE 31-7, at 13-16])]. Also, if needed, Stover could be eligible for medical leave and personal leave, and Amazon offered unpaid personal time ("UPT") that could be utilized for any reason. *Id.* Stover was permitted to use both PTO and UPT by entering it on his phone or computer and was not required to notify a manager or otherwise seek approval. *Id.* at 5 (citing [DE 31-9, at 13-14; DE 31-10, at 4-5; DE 31-11, at 9-10]). Each day, Stover was given a one (1) hour lunch break, two (2) fifteen (15) minute breaks, and ten (10) minutes of personal time, which could not exceed twenty (20) minutes per week. [DE 31-1, at 5; DE 31-9, at 13; DE 35, at 5].

When working, Customer Service Associates, such as Stover, maintained an "aux" state that reflected their status, such as being on a call with a customer, conducting post-call work, attending team meetings, taking rest breaks, and utilizing PTO or UPT. [DE 31-1, at 5 (citing [DE 31-9, at 7-8, 17-18, 23; DE 31-10, at 8-9, 13-14])]. Amazon's management could run reports and

study the aux states Customer Service Associate used during shifts. *Id.* (citing [DE 31-9, at 6, 9; DE 31-10, at 8-9]).

On November 17, 2016, Stover met with Amazon's Human Resources Business Partner ("HRBP"), Carly Peabody, who noted, "[Stover] has shared that he has a chronic illness that requires him to frequently visit the restroom. Oftentimes, this need occurs without notice and cannot be planned for within a work day [sic]. [Stover] has requested additional break time to allow him to visit the restroom, as needed." [DE 31-12, at 3]; *see also* [DE 31-1, at 5]. Peabody informed Stover, "[It] is not site practice to offer additional break time, or to allow for unscheduled breaks. However, we are able to consider an adjustment to his break schedule or any other recommendations that his physician may have based upon his specific needs." [DE 31-12, at 3]. In the meantime, Peabody allegedly offered Stover the option to adjust his break schedule at his request. *Id.* However, Stover contends he was only told he was ineligible for an accommodation because he was not a permanent employee at that time, [DE 35, at 5-6 (citing [DE 35-5, at 2])], but during his August 24, 2019 deposition, he asserted that "'[i]t's possible'" that he received some of the November 2016 e-mail communications, [DE 39-1, at 5-9 (quoting [DE 39-1, at 45-46])].

Also, on November 17, 2016, Peabody e-mailed Stover the required forms, including a Request for Medical Information

("RMI") form, and human resources ("HR") associate Doris Taylor hand-delivered physical copies of the forms to Stover. [DE 31-1, at 6 (citing [DE 31-12, at 9])]. Stover admits he received the forms, but he reasserts that he believed he was ineligible for accommodations because he was not a permanent employee. [DE 35, at 6]. LOAA team member Elizabeth Russman was assigned to Stover's case. [DE 31-1, at 6 (citing [DE 31-12, at 2])].

On November 25, 2016, having made no appointment with his doctor to complete the RMI, Stover requested Taylor grant him an extension, and Taylor extended Stover's deadline to return the completed RMI to November 30, 2016. *Id*. (citing [DE 31-12, at 10]). On November 30, 2016, Taylor called Stover to remind him that the RMI was due. *Id*. (citing [DE 31-12, at 11]. When Taylor did not receive the RMI, she closed Stover's accommodation request case. *Id*. Despite the case being closed, had Stover reached back out to provide the required information or let Taylor know he scheduled a doctor's appointment, it could have been reopened. *Id*. (citing [DE 31-12, at 11; DE 31-8, at 7-8]).

On February 1, 2017, Stover met with his gastroenterologist, Dr. Stephen Schindler for the first time since June 14, 2016. [DE 31-1, at 6 (citing [DE 31-14])]. Dr. Schindler noted that "Stover had been noncompliant with treatment, his weight was stable, he was having 2-3 mostly formed bowel movements per day, and he had no bleeding." *Id*. at 6-7 (citing [DE 31-14]). During his

appointment with Dr. Schindler, "Stover requested to resume a biologic medication for his Crohn's disease." *Id*. at 7 (citing [DE 31-14]).

On February 18, 2017, with the knowledge that Stover had Crohn's disease and having already received a request for accommodation that was ultimately closed due to Stover's inaction, Amazon offered Stover a full-time, at-will Customer Service Associate position at the Winchester, Kentucky, call center, and on February 19, 2017, Stover accepted the offer. [DE 31-1, at 6 (citing [DE 31-13])]. In or around March 2017, Stover was assigned to Amazon's "'Search and Rescue Team,'" which "handled previously unresolved calls from customers, and these calls required assigned Associates to demonstrate problem-solving savvy and patience with customers," [DE 31-1, at 6 (citing [DE 31-3, at 6-7; DE 31-9, at 5, 24-25])].

On March 7, 2017, Stover contacted HRBP Breah Abney to request that his accommodation case be reopened. *Id*. at 7 (citing [DE 31-15]). Abney provided Stover with new copies of the required forms, including the RMI, with a March 20, 2017, deadline to return the completed documents. *Id*. Amazon asserts that on March 19, 2017, Stover requested an extension of time to submit the documents because he had been unable to meet with his physician. *Id*. (citing [DE 31-12]). However, the exhibit cited by Amazon, [DE 31-12], does not support Amazon's statements regarding the March 19, 2017,

request for an extension of time and Stover's alleged reasoning for needing an extension. "Stover recalls that in fact he *did* submit the paperwork prior to March 19, 2017, but Human Resources lost it." [DE 35, at 6]. Additionally, Stover insists, "This was the reason he requested an extension of time on March 19 in order to re-submit." *Id.*

On April 12, 2017, Stover completed an Associate Certificate of Fitness ("COF") form, which stated that he "had a '[g]astrointestinal' issue that 'impacts [his] ability to work as [he] require[s] more breaks for bathroom use . . .'" and would "'need to miss work or take time off for flare ups and to receive medication through infusion.'" [DE 31-1, at 7 (quoting [DE 31-16])]. While Stover listed no medications on his COF form, during his August 24, 2019, deposition, he asserted this was due to him not having enough space to list them and advised, "I was taking medications. I believe I was taking ENTYVIO, budesonide. I was also taking prednisone and one other medicine . . . ." [DE 35, at 6-7 (citing [DE 35-1, at 10])].

On April 18, 2017, Stover had an urgent-care visit at Concentra where he reported that he had experienced "'mid-abdominal pain and diarrhea for 2-3 weeks'" and that he wanted to be prescribed medication until he could attend his appointment with Dr. Schindler in three (3) days. [DE 31-1, at 7 (quoting [DE

31-17])]. At that time, Stover stated that his last Crohn's disease episode occurred two (2) years prior to his Concentra visit. *Id.*

On April 19, 2017, Amazon received a completed RMI from Dr. Schindler's office. [DE 31-1, at 7-8 (citing [DE 31-18])]. On the RMI, Dr. Schindler's selections indicated Stover had a permanent medical situation, but the impairment did not prevent him from performing his job duties. *Id.* at 8 (citing [DE 31-18, at 1]). Dr. Schindler stated the impairment was that Stover "'can have diarrhea—can work full time but needs access to bathroom facility.'" *Id.* Dr. Schindler found Stover's impairment did not result in trouble performing his job functions, Stover experienced diarrhea and abdominal pain, Stover was safe to be at work, and Stover's walking, standing, and digestion were affected by the impairment. *Id.* Dr. Schindler further found that the only limitation interfering with Stover's job performance was that he "'must have bathroom facility readily available.'" *Id.*

On April 21, 2017, Stover attended an appointment with Dr. Schindler, who noted Stover's weight was stable, he was not experiencing significant abdominal pain, and his diarrhea was "'under relatively good control.'" [DE 31-1, at 8 (quoting [DE 31-20, at 1])]. Dr. Schindler further noted that they were "'awaiting approval for Entyvio.'" *Id.* On April 24, 2017, having reviewed Stover's RMI, and believing clarification was required to determine what accommodation was needed, Russman placed Stover's

accommodation request on "'pending EE response'" status while she sought clarification from Dr. Schindler. *Id.* at 8 (quoting [DE 31-12, at 12]). On April 28, 2017, Russman received a voicemail from Stover stating that he was obtaining the requested clarification documents, needed to work thirty-two (32) hours per week instead of forty (40), and "needed to be able to use a restroom in the event of an episode." *Id.* (citing [DE 31-12, at 13]).

On May 8, 2017, the deadline for Stover to return the clarifying information, Russman left Stover a voicemail following up on the request. *Id.* On May 10, 2017, after not receiving the requested clarifying information, Russman sent Stover a letter informing him that his participation was needed to complete the accommodations process. *Id.* at 9 (citing [DE 31-8, at 12-13; DE 31-21; DE 31-12, at 13]). Russman closed the case and noted, "'[C]urrent information does not need accommodation—EE has free access to restroom as needed.'" *Id.* (quoting [DE 31-12, at 13]).

Amazon claims, "The LOAA team never denied Mr. Stover's request for accommodations at any time during Mr. Stover's employment." [DE 31-1, at 9 (citing [DE 31-8, at 9, 11; DE 31-12])]. During his deposition, Stover testified that he received oral denials, [DE 35, at 7 (citing [DE 35-1, at 4])], but these denials were from HR employees Abney and Palak Patel, who were not LOAA team members, [DE 39-1, at 13 (citing [DE 39-1, at 32-38])]. In May 2017, Stover decided he was "done" with requesting

accommodations from Amazon, explaining, "[A]fter being told no multiple occasions, multiple times, I saw no real benefit to doing it more." [DE 31-3, at 33]. Stover did not attempt to request accommodations again. [DE 31-1, at 9 (citing [DE 31-3, at 33; DE 31-12])].

On May 25, 2017, Stover received his first Entyvio injection. *Id.* (citing [DE 31-22]). On both June 15, 2017 and July 19, 2017, Stover received additional Entyvio injections and stated that he was "'feeling well.'" *Id.* (quoting [DE 31-23; DE 31-24]). Around August 2017, Stover began reporting to Team Manager Michelle Nemeth, a new Amazon employee. *Id.* at 9-10 (citing [DE 31-3, at 60-61; DE 31-10, at 2]). Nemeth supervised the Search and Rescue Team's night shift, and Team Manager James Lunsford supervised the day shift. *Id.* at 10 (citing [DE 31-9, at 4]). While Nemeth and Lunsford supervised different shifts, Nemeth regularly consulted with Lunsford, who had been with Amazon for some time. *Id.* (citing [DE 31-10, at 11-12; DE 31-11, at 5-6, 12]).

Again, on September 13, 2017, Stover received an Entyvio injection and reported that he was "'feeling well.'" *Id.* (quoting [DE 31-25]). On September 19, 2017, Stover appeared on the "Top/Bottom 10% Report," which indicated he was performing poorly on his positive response rate ("PRR") score. *Id.* (citing [DE 31-26]). That same day, Nemeth provided Stover a "First Written Warning" because his PRR score was repeatedly in the bottom ten

(10) percent, which Stover refused to sign. *Id*. (citing [DE 31-27]).

Around late September 2017, Amazon held a meeting to announce it was no longer going to offer Level 3 Customer Service Associate positions and would instead only have Level 2 positions. *Id*. (citing [DE 31-9, at 19-22]). Stover was a Level 2 Customer Service Associate, and during Lunsford's September 6, 2019, deposition, he asserted that Stover, hoping to be promoted to a Level 3 position, became "so much combative at that time that the [Winchester] site leader[, Brett Schultz,] had to stop the meeting and tell [Stover] if he was that unhappy, nobody was forcing him to stay at Amazon." [DE 31-9, at 20].

On September 21, 2017, following Nemeth's meeting with Stover regarding his PRR score and Nemeth's request that Stover write an honest e-mail about how he was feeling and what Stover thought it meant to be a leader, Stover sent Nemeth an e-mail that contained the following:

> Now I want you to know that I am pissed and that the way that I have been treated is not the way you should treat your most influential employee; because you will need to get me on board with what ever [sic] half assed idea corporate is pitching to us so that we can prepare ourselves or again, you will find yourself faced with a shit storm that I will funnel larger and larger. I understand that it is a shitty thing for me to do but so is what Amazon has just done to us; so again, either get your biggest perpetrators on board or end up with shit hitting the fan again.

> I understand what it means to be a leader which is why
> I know people will listen to me and I know that my
> personality is one that can push people to react in the
> way that I want. I want to make sure that we understand
> each other and you are listening to me; because I will
> be heard, and I am a hard person to ignore especially
> when you shit in my pool.

[DE 31-1, at 10-11 (quoting [DE 31-28])]; *see also* [DE 35, at 8
(quoting [DE 35-1, at 14])]. Nemeth regarded Stover's e-mail as
threatening, and as of September 6, 2019, the date of her
deposition, she was still bothered by the e-mail. [DE 31-1, at 11
(citing [DE 31-11, at 13])].

On October 7, 2017, Stover e-mailed Operations Manager Adam
Wilson, with Lunsford copied on the e-mail, and stated, "There are
some TM's in the building who are micromanaging other team's Aux
states. They are going in and taking people out of ACW or break or
any other aux state when they go even a few seconds over." [DE 31-
29]; *see also* [DE 31-1, at 11 (quoting [DE 31-29])]. During
Stover's August 24, 2019, deposition, he specifically alleged,
"Michelle [Nemeth] had apparently had other team leaders on other
teams watching our aux states and taking us out of after call work
or lunch or break or whatever if we had started to go over on it."
[DE 31-3, at 38]; *see also* [DE 31-1, at 11 (citing [DE 31-3, at
38])].

On October 19, 2017, Nemeth presented Stover with a "Final
Written Warning" because it was discovered that Stover ended two
separate phone calls with customers by hanging up on them. [DE 31-

1 (citing [DE 31-30; DE 31-9, at 10-12, 15-16; DE 31-11, at 2-4, 7-8])]. Prior to giving Stover the "Final Written Warning," Nemeth sought Lunsford's assistance to ensure she did everything correctly. [DE 31-1, at 11 (citing [DE 31-9, at 10-11; DE 31-11, at 5])].

On October 25, 2017, Stover attended an appointment with Dr. Schindler and reported that he was feeling well and had "'markedly improved'" on Entyvio, two (2) formed bowel movements per day, no bleeding, no abdominal pain, gained more than twenty (20) pounds, and no complaints. [DE 31-1, at 11-12 (quoting [DE 31-31])]. Both Dr. Schindler, Stover's proposed Crohn's disease expert, and Dr. Richard Bloomfeld, Amazon's proposed Crohn's disease expert, agree that while Stover was employed by Amazon and receiving Entyvio treatments, his Crohn's disease was in "'clinical remission.'" *Id.* at 12 (quoting [DE 31-19, at 2-4; DE 31-32, at 5]). On November 8, 2017, Stover received another Entyvio injection from Dr. Schindler and reported that he was "'feeling well.'" *Id.* (quoting [DE 31-33]). Also, on November 8, 2017, Stover applied for a Wireless Customer Service Support Agent position with Xerox, his prior employer. *Id.* (citing [DE 31-34]).

On November 22, 2017, Nemeth e-mailed Stover regarding his excessive break times for the week of October 8-14, 2017, and she sent another e-mail later that day concerning Stover's excessive break times for the week of November 15-18, 2017. [DE 31-1, at 12

(citing [DE 31-35])]. Despite the two (2) weeks in question being separated by more than a month, in response to both e-mails, Stover explained that both he and his wife were suffering from an apparent case of food poisoning. *Id.; see also* [DE 35, at 9].

On November 30, 2017, Nemeth had a "seek-to-understand" discussion with Stover regarding why he had missed a high number of calls the preceding four (4) weeks. [DE 31-1, at 12 (citing [DE 31-36])]. Stover explained that he was having system issues, and Nemeth instructed "him to aux into meeting and get a new computer from IT." *Id.* On December 6, 2017, Stover told Nemeth that he had been unable to go to IT to get a new computer, so Nemeth "directed him to aux into meeting right then and go obtain a new computer." *Id.* (citing [DE 31-37]). Additionally, Nemeth "told [Stover] that moving forward he needed to email [her] with every call that he misses so [they could] make sure to fix his trend of 50-80 missed calls." [DE 31-37].

Also, on December 6, 2017, Nemeth had a "seek-to-understand" discussion with Stover concerning him returning late from breaks and lunches and going over his allotted amount of personal time during the month of November 2017. [DE 31-1, at 13 (citing [DE 31-38])]. Since Stover advised that the reason for his failure to adhere to Amazon's break policies was due to his Crohn's disease, Nemeth asked Stover if he would like to make an accommodation request. *Id.* Stover said that "'he did not want to do any type of

accommodation request for his Crohn's disease,'" and Nemeth explained that without Stover requesting and receiving an accommodation, starting December 7, 2017, she would have to start holding him accountable for violating Amazon's break policies. *Id.* (quoting [DE 31-38]). That same day, Stover e-mailed Lunsford a link to his internal drive containing his notes, websites, and files "'in case [he] quit or [was] fired for some reason.'" *Id.* (quoting [DE 31-39]).

On December 13, 2017, Stover e-mailed Nemeth to inform her that his break time for that day was incorrectly recorded in the system. *Id.* (citing [DE 31-40]). After receiving Stover's e-mail, Nemeth checked a report of Stover's recent aux-states and discovered that between November 17, 2017 and December 16, 2017, Stover had been inappropriately using the aux-state settings to avoid taking calls near the end of his shift, and Nemeth testified that Stover admitted to this behavior. *Id.* at 13-14 (citing [DE 31-10, at 10-11, 15-19; DE 31-41]); *see also* [DE 31-10, at 8-9]. On December 21, 2017, Amazon terminated Stover's employment, and as Stover was escorted out of the building, Nemeth and a member of HR, possibly Abney, informed Stover of Amazon's termination decision. *Id.* at 14 (citing [DE 31-10, at 20-21; DE 31-41])].

On February 21, 2018, Stover began working part-time as a Photographer for Inter-State Studio & Publishing Co. *Id.* (citing [DE 31-42]). On March 24, 2018, Stover began additional part-time

employment as a Field Representative for Premium Retail Services, Inc., where he worked until the week ending June 30, 2018. *Id.* (citing [DE 31-43]). Stover asserts, "I stopped working at Premium Retail in May [2018] because I had a flare-up that knocked me out of working for about two weeks." [DE 31-3, at 48]. Around July 22, 2018, Stover went three (3) or four (4) months without working because his father-in-law died, and he and his wife moved out of their apartment and into the deceased's house. [DE 31-1, at 14 (citing [DE 31-3, at 48]); DE 35, at 9 (citing [DE 31-3, at 48])].

During the biweekly pay period from January 9, 2019 to January 22, 2019, Stover began his employment with Bumblebee Screen Printing. [DE 31-1, at 14 (citing [DE 31-44])]. Stover earns less at Bumblebee Screen Printing than he would have had he remained employed by Amazon, and as of August 24, 2019, the date of Stover's deposition, he was not seeking other employment. *Id.* (citing [DE 31-3, at 53]). In both Stover's deposition and his Response [DE 35], he asserts that Amazon did not raise their wages until after he was terminated. [DE 35, at 10 (citing [DE 31-3, at 53])]. Regarding Stover's search for employment, he testified that while Xerox, his previous employer, accommodated his needs related to his Crohn's disease and offer wages and benefits that are roughly equivalent to those of Amazon, he did not see himself working in another call center because he likes to work with his hands. *See* [DE 31-1, at 14 (citing [DE 31-3, at 54-56])]. So, following his

termination from Amazon, he did not apply to return to Xerox. [DE 31-3, at 54-56].

On February 1, 2019, Stover visited Dr. Schindler for the first time in over a year, which Stover explained was due to his loss of insurance. [DE 31-1, at 15 (citing [DE 31-45])]. Dr. Schindler noted that Stover had "'some symptoms of loose bowel movements and some cramping,'" did not have severe diarrhea, had a stable weight, and did not have bleeding. *Id.* Dr. Schindler further noted, "'[Stover] was on Entyvio however he did not like having to come in for IV infusions much.'" *Id*. Dr. Schindler concluded that he would consider prescribing Stover "Stelara pending his biopsies." [DE 31-45].

On February 15, 2019, Stover filed the present action, alleging Amazon violated both the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq., and the Kentucky Civil Rights Act ("KCRA"), KRS § 344, by failing to provide Stover reasonable accommodations in the form of restroom breaks and scheduling adjustments every fifty-six (56) days and by wrongfully terminating Stover by reason of disability discrimination. [DE 1]. Regarding relief, Stover seeks compensatory damages of at least $3,000,000.00, punitive damages, attorneys' fees and costs, statutory remedies provided by the ADA and the KCRA, statutory interest on all monetary damage awards, verdicts, or judgments, and all other relief the Court may deem appropriate. *Id*. at 17.

On March 18, 2019, Stover met with Davika Mattox, APRN-PMHNP, at Recovery Wellness Behavioral Health for the first time and reported that he had been depressed since childhood, had slept poorly for years, and had "'low energy and low motivation, decreased interest and enjoyment, [and] . . . history of thoughts of death.'" [DE 31-1, at 15 (quoting [DE 31-46])]. Stover further reported he had "'symptoms of untreated schizophrenia, restless legs, visual hallucinations, [and] paranoia.'" *Id.*

On April 18, 2019, Stover attended a follow-up appointment with Dr. Schindler, who noted that Stover's symptoms were "'very mild on no medications.'" *Id.* (quoting [DE 31-47]). Dr. Schindler added, "[Stover] was recently on Entyvio but he tells me that it causes a lot of cramping and it was also cost prohibitive." [DE 31-47]; *see also* [DE 31-1, at 15 (quoting [DE 31-47])]. Stover reported that he was experiencing between one (1) and three (3) bowel movements per day, no bleeding, and no significant abdominal pain. [DE 31-1, at 15 (quoting [DE 31-47])]. Dr. Schindler noted Stover's weight was stable. *Id.* In conclusion, Dr. Schindler decided, "I think Stelara would be a good choice for [Stover] since he could give himself injections and would not incur any infusion costs after his initial infusion. I am going to look into this for him." [DE 31-47]; *see also* [DE 31-1, at 15 (quoting [DE 31-47])].

On October 7, 2019, Amazon filed the present Motion for Summary Judgment [DE 31], which shall be discussed further herein.

## II. STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute exists on a material fact, and thus summary judgment is improper, if the evidence shows 'that a reasonable jury could return a verdict for the nonmoving party.'" *Olinger v. Corporation of the President of the Church*, 521 F. Supp. 2d 577, 582 (E.D. Ky. 2007) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). Stated another way, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. "The central issue is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Pennington,* 553 F.3d at 450 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251-52 (1986).

The moving party has the initial burden of demonstrating the basis for its motion and identifying those parts of the record that establish the absence of a genuine issue of material fact. *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002). The movant may satisfy its burden by showing "that there is an absence of evidence to support the non-moving party's case."

*Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the movant has satisfied this burden, the non-moving party must go beyond the pleadings and come forward with specific facts demonstrating the existence of a genuine issue for trial. Fed. R. Civ. P. 56; *Hall Holding*, 285 F.3d at 424 (citing *Celotex*, 477 U.S. at 324). Moreover, "the nonmoving party must do more than show there is some metaphysical doubt as to the material fact. It must present significant probative evidence in support of its opposition to the motion for summary judgment." *Hall Holding*, 285 F.3d at 424 (internal citations omitted).

The Court "must construe the evidence and draw all reasonable inferences in favor of the nonmoving party." *Pennington v. State Farm Mut. Automobile Ins. Co.,* 553 F.3d 447, 450 (6th Cir. 2009) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)). However, the Court is under no duty to "search the entire record to establish that it is bereft of a genuine issue of material fact." *In re Morris*, 260 F.3d 654, 655 (6th Cir. 2001). Rather, "the nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *Id*.

## III. DISCUSSION

Amazon moves for summary judgment, asking the Court to dismiss each of Stover's claims with prejudice. [DE 31-1, at 16]. Each of Amazon's arguments will be discussed in turn.

### A. STOVER'S CLAIMS AGAINST AMAZON.COM, LLC AND AMAZON.COM, INC.

Amazon argues, "Stover cannot pursue claims against Amazon[.com,] LLC and Amazon[.com,] Inc., neither of which employed him at any time, because the statutes under which he brings his claims require those claims be against employers." [DE 31-1, at 16]. Pursuant to the ADA, "No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). "The term 'covered entity' means an employer, employment agency, labor organization, or joint labor-management committee." 42 U.S.C. § 12111(2). Similarly, pursuant to KRS § 344.040, it is unlawful for an "employer" to "discharge any individual, or otherwise to discriminate against an individual with respect to compensation, terms, conditions, or privileges of employment . . . because the person is a qualified individual with a disability."

Here, Stover admits Amazon.com, LLC and Amazon.com, Inc. were not his employers. Specifically, during Stover's deposition, he

testified, "[W]e weren't quite sure which one was the actual owner of the Winchester site, so we put down all three just to cover our bases." [DE 31-3, at 2]. Stover further testified, "Amazon.com, LLC, is – and Amazon.com, Incorporated, are not the entities that were the ones that employed me," and he asserted that he did not "know of" any allegations that he had against either Amazon.com, LLC or Amazon.com, Inc. *Id*. at 59. In Stover's Response [DE 35], he "agrees that discovery has shown that the entity employing Mr. Stover in 2016-2017 was AMZN WACS LLC, 410 Terry Avenue North Seattle, Washington 98109." [DE 35, at 12]. However, Stover asserts, "[AMZN WACS LLC, a] Delaware entity[,] filed its Certificate of Withdrawal with the Kentucky Secretary of State on January 10, 2019, and its current status is 'inactive.'" *Id*. Accordingly, Stover does not object to the dismissal of Amazon.com, LLC and Amazon.com, Inc., but he does asks that "the Court do so without prejudice to Plaintiff's further rights to proceed against them anew should facts emerge warranting reinstatement of them to this case." *Id*.

Since Stover does not object to the dismissal, and neither entity employed Stover, the Court shall dismiss both Amazon.com, LLC and Amazon.com, Inc. Moreover, the Court shall do so with prejudice. Discovery in this case has been completed since September 6, 2019. [DE 12]. If Stover was going to find facts that support claims against Amazon.com, LLC and Amazon.com, Inc., he

should have done so before now. There is no evidence in the record that either entity employed Stover, and he admits they did not. *See* [DE 35, at 12]. The Court will not allow Stover to keep Amazon.com, LLC and Amazon.com, Inc. on the hook indefinitely based on the mere possibility that some otherwise unknown facts may emerge.

## B. THE TIMELINESS OF STOVER'S ADA FAILURE-TO-ACCOMMODATE CLAIMS

Amazon argues, "[S]ummary judgment should be granted on Mr. Stover's attempted failure-to-accommodate ADA discrimination claims because he failed to file a charge of discrimination with the [Equal Employment Opportunity Commission ('EEOC')] in time." [DE 31-1, at 17].

In *Parry v. Mohawk Motors of Michigan, Inc.*, the Court of Appeals for the Sixth Circuit found, "Under the ADA, a claimant who wishes to bring a lawsuit claiming a violation of the ADA must file a charge of discrimination with the EEOC within 300 days of the alleged discrimination." 236 F.3d 299, 309 (6th Cir. 2000) (citing 42 U.S.C. § 12117(a); 42 U.S.C. § 2000e-5(e)(1); *Jones v. Sumser Retirement Village,* 209 F.3d 851, 853 (6th Cir. 2000)).

In the present case, Amazon cites the following testimony from Stover's deposition to support its argument that after May 2017, Stover failed to seek accommodations from Amazon, so his ADA claims must be found untimely:

Q. Okay. And I guess let me be clear about this from the
record. After May 2017, I'll just use May generally—
A. Yeah.
Q. -May 2017, did you ever seek accommodations again
from Amazon?
A. **No, I did not try to seek accommodations again.**
. . . .
Q. You were done?
A. Yeah, I was done.

[DE 31-1, at 17-18 (quoting [DE 31-3, at 33])]. Additionally,

Amazon argues, "Stover failed to file his EEOC charge until July

17, 2018—more than 400 days after May 31, 2017." *Id*. at 18 (citing

[DE 31-48]).

Stover contends his claims are not time-barred "because

discovery has shown that *discrete acts* of disability-based

discrimination against Mr. Stover by Amazon continued throughout

his employment, including between December 6, 2017 and until his

termination on or about December 22, 2017, constituting a

continuing violation of Mr. Stover's rights to be free from

disability discrimination." [DE 35, at 12 (emphasis added)].

However, following the Supreme Court's decision in *National

Railroad Passenger Corp. (Amtrak) v. Morgan*, 536 U.S. 101, 111-14

(2002), the Sixth Circuit "held that '*Morgan* overturns prior Sixth

Circuit law addressing serial violations, i.e., plaintiffs are now

precluded from establishing a continuing violation exception by

proof that the alleged acts of discrimination occurring prior to

the limitations period are sufficiently related to those occurring

within the limitations period.'" *Taylor v. Donahoe*, 452 F. App'x

614, 619 (6th Cir. 2011) (quoting *Sharpe v. Cureton,* 319 F.3d 259, 268 (6th Cir. 2003)). Accordingly, "[w]hen an employee alleges *discrete acts* of discrimination or retaliation, the continuing violation doctrine may not be invoked to allow recovery for acts occurring outside the filing period." *Id.* (citing *Sharpe*, 319 F.3d at 267) (emphasis added). Since Stover's contention is that discrete acts of discrimination occurred within the limitations period, namely between December 6, 2017 and December 22, 2017, under the continuing violation doctrine, he is not entitled to consideration of his ADA failure-to-accommodate claims regarding discriminatory acts that occurred more than 300 days prior to the date he filed his EEOC charge, July 17, 2018.

Instead of arguing that the acts of discrimination that allegedly occurred prior to the limitations period were related to the acts that allegedly occurred within the limitations period, to establish a continuing violatioin, Stover was required to demonstrate that "a longstanding and demonstrable policy of discrimination" existed. *Sharpe*, 319 F.3d at 268 (citing *Tenenbaum v. Caldera,* Nos. 00-2394, 01-1704, 2002 WL 2026347, at *2 n.3 (6th Cir. Aug. 29, 2002)). "To establish this category of continuing violation, '[the plaintiff] must demonstrate something more than the existence of discriminatory treatment in his case.'" *Id*. at 268-69 (quoting *Haithcock v. Frank*, 958 F.2d 671, 679 (6th Cir. 1992)). "'The preponderance of the evidence must establish that

some form of intentional discrimination against the class of which plaintiff was a member was the company's standing operating procedure.'" *Id.* at 269 (quoting *EEOC v. Penton Indus. Publishing Co.,* 851 F.2d 835, 838 (6th Cir. 1988)).

Here, Stover neither represents a class nor establishes a class of which he was a member was discriminated against. In Stover's Sur-Reply [DE 48], he asserts that Amazon's break policy discriminates against not only Stover but also to "any employee to whom it applies having a sudden, urgent need for a restroom outside of the permissible time parameters of Amazon['s] policy" and affects "not just employees with Crohn's disease or other bowel conditions, but others also, such as pregnant women or anyone with issues of urinary urgency." [DE 48, at 3]. Stover's assertions are not sufficiently supported by the record, and he has failed to meet his burden of proving the existence of a discriminatory policy that affects anyone other than himself, let alone a class of people. *See Sharpe* 319 F.3d at 269 (finding the plaintiffs' broad allegation that "Ashe's disregard to constitutional rights spans three decades impacting more than these plaintiffs" to be insufficiently supported by the record). Instead, Stover has consistently attempted to prove the existence of discriminatory acts aimed at him, which does not allow him to invoke the continuing violation exception. Accordingly, Stover's ADA failure-to-accommodate claims regarding discriminatory acts that occurred

more than 300 days prior to the date he filed his EEOC charge, July 17, 2018, are time-barred.

### C. STOVER'S CROHN'S DISEASE UNDER THE KCRA

Amazon argues, "Stover's KCRA claims should be dismissed because his Crohn's disease fails to meet the standard to be a disability." [DE 31-1, at 18]. Amazon further argues the Court should use the the KCRA's definition of "disability" rather than the definition found in the ADA Amendments Act of 2008 ("ADAAA"), and the Court agrees. *Id.*

In *Krueger v. Home Depot USA, Inc.*, the Sixth Circuit found, "[T]he Kentucky legislature adopted the language in the KCRA in 1992 and intended it to reflect the language of the ADA at that time, not the subsequent amendments. Thus, the KCRA retains the ADA's former definition of disability." 674 F. App'x 490, 494-95 (6th Cir. 2017) (citing *Azzam v. Baptist Healthcare Affiliates, Inc.*, 855 F. Supp. 2d 653, 657 n.2 (W.D. Ky. 2012) ("The Court will not assume that the Kentucky legislature, by drafting language in 1992 that mirrored federal law at the time, *see* 1992 Ky. Acts 282, § 1, intended to incorporate federal legislative alterations that occurred in 2008.")); *see also Breen v. Infiltrator Systems*, 417 F. App'x 483, 486 (6th Cir. 2011); *Sanders v. Bemis Co., Inc.*, No. 3:16-CV-00014-GFVT, 2017 WL 3401277, at *5 n.3 (E.D. Ky. Aug. 8, 2017); *Ezell v. Renal Care Group, Inc.*, No. 5:17-CV-002-TBR-LLK, 2018 WL 2054562, at *12 (W.D. Ky. May 2, 2018); *Laferty v.*

*United Parcel Service, Inc.*, 186 F. Supp. 3d 702, 707 n.3 (W.D. Ky. 2016) (collecting cases); *Larison v. Home of the Innocents*, 551 S.W.3d 36, 43 (Ky. 2018).

With respect to an individual, the KCRA defines "disability" as "(a) A physical or mental impairment that substantially limits one (1) or more of the major life activities of the individual; (b) A record of such an impairment; or (c) Being regarded as having such an impairment." KRS § 344.010(4); *see also* 42 U.S.C. § 12102(1).

First, the Court considers whether Stover had either an impairment that substantially limits a major life activity or a record of such an impairment. The mere fact that a plaintiff has an impairment does not alone establish they have a disability, and minor impairments are equally insufficient. *Laws v. HealthSouth N. Ky. Rehabilitation Hosp. Ltd. Partnership*, 828 F. Supp. 2d 889, 912 (E.D. Ky. 2011) (citing *Bryson v. Regis Corp.,* 498 F.3d 561, 575 (6th Cir. 2007) (citing *Toyota Motor Mfg., Ky., Inc. v. Williams,* 534 U.S. 184, 195-96 (2002), *superseded by statute*, Pub. L. No. 110-325, 122 Stat. 3553 (ADAAA) (2009))). "'An 'impairment that only moderately or intermittently prevents an individual from performing major life activities is not a substantial limitation' under the ADA.'" *Id*. at 913 (quoting *Bryson*, 498 F.3d at 576). "A plaintiff instead must show that she is ''significantly restricted in ability to perform either a class of jobs or a broad range of

jobs in various classes.'''" *Id*. at 912 (quoting *Bryson*, 498 F.3d at 576). Moreover, pursuant to the pre-ADAAA standards of the KCRA, the Court must consider the ameliorative effects of medication when determining whether a plaintiff's impairment substantially limits one (1) or more major life activities. *See Sanders*, 2017 WL 3401277, at *5 (quoting *Sutton v. United Air Lines*, 527 U.S. 471, 482-83 (1999), *superseded by statute*, Pub. L. No. 110-325, 122 Stat. 3553 (ADAAA) (2009) ("A person whose physical or mental impairment is corrected by medication or other measures does not have an impairment that presently 'substantially limits' a major life activity.")).

Here, Stover argues his Crohn's disease impaired his ability to work "as [Amazon was] moving his supervisor to threaten immediate policy violation consequences up to termination because ('since') he was not willing to undertake the hopeless task (for the fourth time) of seeking an accommodation through 'HR.'" [DE 35, at 17 (citing [DE 35-3])]. Working and the function of the bowel are both considered major life activities, and Amazon does not dispute that. *See Brown v. Humana Ins. Co.*, 942 F. Supp. 2d 723, 731 (W.D. Ky. 2013) (citing *Howard Baer, Inc. v. Schave*, 127 S.W.3d 589, 592 (Ky. 2003)); *see also* 42 U.S.C. § 12102(2). Instead, Amazon contends that when the mitigating effects of Stover's Entyvio treatment are considered, Stover's Crohn's disease does not qualify as a disability. [DE 31-1, at 19-20].

To support Stover's argument that Crohn's disease meets the requirements to be a disability, he cites to the Western District of Kentucky's decision in *Brown*. [DE 35, at 17 (citing *Brown*, 942 F. Supp. 2d at 731)]. In *Brown*, the Hon. John G. Heyburn, II found a plaintiff's Crohn's disease and Irritable Bowel Syndrome ("IBS") to be disabilities under the KCRA. 942 F. Supp. 2d at 731. However, the *Brown* plaintiff's symptoms and conditions are not analogous to those of Stover, as exemplified by Judge Heyburn's following finding:

> At the very least, using the restroom twenty times in one day, which in Brown's case meant she could spend up to two hours in the restroom in a single day, combined with the abdominal pain her doctor described as accompanying Crohn's flare-ups and IBS symptoms, would likely impede an individual's ability to work, which is considered a major life activity under the KCRA.

*Id.* (citing *Howard Baer, Inc.*, 127 S.W.3d at 592).

Unlike the plaintiff in *Brown*, Stover did not have IBS. He only had Crohn's disease. Additionally, the record shows Stover's symptoms from Crohn's disease were not nearly as severe as the plaintiff in *Brown* nor were they coupled with the symptoms associated with IBS. Whereas the plaintiff in *Brown* had to use the restroom twenty (20) times in one day, Dr. Schindler merely found that Stover required access to restrooms and "'more breaks for bathroom use . . .'" and would "'need to miss work or take time off for flare ups and to receive medication through infusion.'" [DE 31-1, at 7 (quoting [DE 31-16])]; *see also* [DE 31-18, at 1; DE

30

31-12, at 13]. Moreover, both Dr. Schindler and Dr. Bloomfeld, Stover and Amazon's respective experts, agree that during Stover's employment with Amazon and receiving Entyvio treatments, his Crohn's disease was in "clinical remission," which further distances Stover from the plaintiff in *Brown*. [DE 31-19, at 2-4; DE 31-32, at 5].

Between June 15, 2017 and November 8, 2017, Dr. Schindler repeatedly noted that Stover reported he was feeling either "fine" or "well" when taking Entyvio. [DE 31-23; DE 31-24; DE 31-25; DE 31-31; DE 31-33]. Also, Dr. Schindler notes show that between February 1, 2017 to April 19, 2019, Stover's reported bowel movements ranged from having one (1) to three (3) mostly formed bowel movements per day. [DE 31-14; DE 31-31; DE 31-47]. Even when Stover was no longer receiving Entyvio treatment, he reported that he was experiencing one (1) to (3) bowel movements a day. [DE 31-47]. At times, Dr. Schindler noted Stover had loose bowel movements, cramping, abdominal pain, and diarrhea. [DE 31-17; DE 31-18; DE 31-20; DE 31-45]. However, at no time did Dr. Schindler report Stover's symptoms were so severe that he could not work. To the contrary, Dr. Schindler found Stover could "work full time but needs access to bathroom facility." [DE 31-18, at 1].

In his Sur-Reply [DE 48], Stover attempts to combat the previously mentioned reports with testimony from Dr. Schindler and Dr. Bloomfeld, in which both doctors acknowledge that Crohn's

disease is a condition that is variable in nature and produces symptoms that may be mild to nonexistent at times and flare up during others. *See* [DE 48, at 5 (quoting [DE 48-2; DE 48-3])]. While each doctor said Crohn's disease can produce severe symptoms at times, there is no evidence showing Stover's symptoms reached such levels of severity during his employment with Amazon. Instead, the record shows that his Entyvio treatment made his Crohn's disease manageable, and even when he was not on Entyvio, the evidence does not support finding Stover's Crohn's disease substantially limited his ability to work. Accordingly, the Court finds Stover had neither an impairment that substantially limited a major life activity nor a record of such an impairment.

Whether Amazon regarded Stover as having an impairment that substantially limited a major life activity is equally unavailing. There is no doubt that his managers and members of LOAA and HR knew he had Crohn's disease. However, showing an employer knew a plaintiff had a condition or was "'somehow disabled'" is not enough. *Laws*, 828 F. Supp. 2d at 913 (quoting *Jones v. Nissan North America, Inc.,* 438 F. App'x 388, 397 (6th Cir. 2011)). Instead, "'the plaintiff must show that the employer regarded the individual as disabled within the meaning of the ADA.'" *Id*. Here, Stover has failed to show that anyone at Amazon regarded his Crohn's disease as significantly restricting him from working in either a class of jobs or a broad range of jobs in various classes. *See Laws*, 828 F.

Supp. 2d at 912-13. Therefore, the Court will dismiss Stover's KCRA claims because according to KRS § 344.010(4), he is not disabled. Accordingly, the Court will not consider Amazon's further arguments regarding Stover's KCRA failure-to-accommodate and wrongful termination claims failing to meet their respective elements.

## D. STOVER'S ADA FAILURE-TO-ACCOMMODATE AND WRONGFUL TERMINATION CLAIMS

As previously set forth herein, Stover's ADA claims regarding Amazon's alleged failure to provide reasonable accommodations that occurred outside the limitations period are time-barred. Stover also alleged ADA failure-to-accommodate claims that occurred within the limitations period, but for the following reasons, those claims and his ADA wrongful termination claim must also be dismissed.

Amazon argues Stover's fails to establish a *prima facie* case for both his ADA failure-to-accommodate and wrongful termination claims. [DE 31-1, at 22-28]. To establish a *prima facie* ADA failure-to-accommodate claim, Stover must show the following:

> [T]hat (1) [he] was disabled within the meaning of the ADA; (2) [he] was otherwise qualified for [his] position, with or without reasonable accommodation; (3) [Amazon] knew or had reason to know about [his] disability; (4)[he] requested an accommodation; and (5) [Amazon] failed to provide the necessary accommodation.

*Brumley v. United Parcel Serv., Inc.*, 909 F.3d 834, 839 (6th Cir. 2018) (citing *Deister v. Auto Club Ins. Ass'n*, 647 F. App'x 652,

657 (6th Cir. 2016)). To establish a *prima facie* case for wrongful termination under the ADA, Stover must demonstrate the following:

> 1) that he is disabled; 2) that he is otherwise qualified for his previous position with [Amazon], with or without reasonable accommodation; 3) that he suffered an adverse employment decision; 4) that [Amazon] knew or had reason to know of his disability; and 5) that he was replaced or that his position remained open while [Amazon] looked for other applicants.

[DE 31-1, at 26-27 (citing *Plant v. Morton Intern, Inc.*, 212 F.3d 929 (6th Cir. 2000))].

Since KRS § 344.010(4) and 42 U.S.C. § 12102(1) share the same definition for "disability," and for the reasons previously stated herein, Stover cannot demonstrate the first element of either a failure-to-accommodate claim or a wrongful termination claim under the ADA because his Crohn's disease does not meet the ADA's definition of a "disability." Also, for the reasons previously stated herein, Stover has failed to satisfy the third element of a failure-to-accommodate claim and the fourth element of a wrongful termination claim under the ADA because the record does not show Amazon knew or had reason to know that his Crohn's disease met the statutory definition of a disability. Therefore, Stover cannot establish a *prima facie* case for either his failure-to-accommodate claims or his wrongful termination claim under the ADA, so these claims must be dismissed.

## IV. CONCLUSION

For the foregoing reasons, each of Stover's claims against Amazon should be dismissed. Consideration of Amazon's remaining arguments for why Stover's claims should be dismissed is unnecessary. Accordingly,

**IT IS ORDERED** as follows:

(1) Amazon's Motion for Summary Judgment [DE 31] is **GRANTED;**

(2) This matter is **DISMISSED WITH PREJUDICE;** and

(3) This is a final and appealable order.

This 4th day of March, 2020.



Signed By:

*Joseph M. Hood*

Senior U.S. District Judge